# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

In re:

DAHLIA ANDREEN HARRISON,                Case No.: 18-50089-KKS
                                        Chapter: 13

     Debtor.

_____/

## MEMORANDUM OPINION GRANTING DEBTOR'S SANCTIONS MOTION AND FINAL ORDER AWARDING ACTUAL AND PUNITIVE DAMAGES FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY (DOC. 78); AND ORDER TO SHOW CAUSE WHY ADDITIONAL SANCTIONS SHOULD NOT BE IMPOSED AGAINST DELTONA'S BANKRUPTCY COUNSEL PURSUANT TO BANKRUPTCY RULE 9011

Before the Court is an egregious example of deliberate and continuing stay violations by a creditor and its counsel.

## PROCEDURAL HISTORY

The self-represented Debtor filed the Chapter 13 petition commencing this case on March 26, 2018.[1]  On June 14, 2018, Debtor filed a motion for sanctions alleging serious and continuing stay violations.[2] As a result, the Court entered an order to show cause ("OTSC") why

---

[1] Doc. 1.
[2] *Debtor's Complaint* [*sic*] *and Motion for Court to Sanction Creditor, The Deltona Corporation, for Violations of the Automatic Bankruptcy Stay in the Above-Styled Case,* ("Sanctions Motion," Doc. 78; amended at Doc. 132).

creditor, The Deltona Corporation ("Deltona"), should not be held in contempt for willful violation of the stay.[3] After receiving evidence, taking testimony and hearing argument at a hearing on July 16, 2018 ("OTSC Hearing"), the Court entered an interim order determining that Deltona had willfully violated the automatic stay and ordering Deltona to brief whether the Court should award damages for emotional distress and punitive damages.[4]

At the final evidentiary hearing ("Final Hearing") on August 27, 2018 the Court took testimony of the Debtor, an employee of Deltona, Dwight Worthington ("Mr. Worthington"), a Deputy Clerk of Court for Washington County, Florida, Tamara Donjuan ("Deputy Clerk Donjuan"), and a Deputy Sheriff, Landon Fries, with the Washington County Florida Sheriff's Department. The Court also received documentary and video evidence from Deltona.[5]

---

[3] *Amended Order to Show Cause Why The Deltona Corporation Should Not be Sanctioned for Violation of the Automatic Stay* (Doc. 121).

[4] *Interim Order on Debtor's Complaint and Motion for Court to Sanction Creditor, The Deltona Corporation, for Violations of the Automatic Bankruptcy Stay in the Above-Styled Case* ("Interim Order," Doc. 149: "After the parties have submitted their papers, the Court will schedule such additional hearings as may be necessary to resolve all remaining issues, potentially including an evidentiary hearing to determine the amount of damages.") The Interim Order contains a scrivener's error: It states the date of the foreclosure sale was April 27, when in fact the sale date was March 27, 2018. *Id.* at p. 4.

[5] Just prior to the Final Hearing the Debtor filed a motion to suppress the video evidence, Doc. 204; the Court denied that motion at the hearing. Doc. 221.

At the conclusion of the Final Hearing the Court announced that it would award damages, including punitive damages. The findings of fact, conclusions of law, and determination of the appropriate amounts of damages are contained in this Memorandum Opinion and Final Order.[6]

## BACKGROUND

Debtor has been engaged in a years-long battle with Deltona over property in Chipley, Florida ("Chipley Property") that she claims as her homestead. At some point Debtor stopped making payments to Deltona, so Deltona filed suit to foreclose on the Chipley Property on June 18, 2015.[7] Debtor filed the petition commencing this case one day before the Chipley Property was scheduled to be sold at foreclosure by the Clerk of Court, Washington County, Florida pursuant to a Final Judgment of Foreclosure ("FJ").[8]

This is Debtor's third bankruptcy case since October of 2016. Debtor filed two prior bankruptcy cases in the Northern District of Georgia; the first on October 21, 2016 and the second on July 26, 2017.[9]  Debtor's first

---

[6] Fed. R. Civ. P. 52(a)(1) made applicable by Fed. R. Bankr. P. 7052.

[7] Doc. 42, p. 1.

[8] *See* Proof of Claim 1-1, p. 7.

[9] *In re Harrison*, Case No.: 16-68804-PMB (Bankr. N.D. Ga.), filed October 21, 2016, dismissed February 2, 2017; *In re Harrison*, Case No.: 17-62962-PMB (Bankr. N.D. Ga.), filed July 26, 2017, dismissed December 7, 2017.

case ("First Georgia Case") was dismissed on February 2, 2017 (more than twelve (12) months prior to the instant case),[10] and her second case ("Second Georgia Case") was dismissed on December 7, 2017.[11] In both Georgia cases, Debtor filed Chapter 13 plans and made plan payments.[12] Neither of Debtor's Georgia cases was dismissed because Debtor failed to obey court orders or file required documents.

Debtor's first two cases stayed hearings on Deltona's motion for summary judgment in the foreclosure case. Deltona obtained its FJ after Debtor's Second Georgia Case was dismissed.[13] But for Deltona's and its state and bankruptcy counsel's actions, the petition commencing the current case should have stayed the foreclosure sale.

On the same day that she filed the petition commencing this case Debtor filed a motion to extend the automatic stay which the Court set for hearing on April 12, 2018.[14] Deltona's bankruptcy counsel filed an

---

[10] *In re Harrison*, Case No.: 16-68804-PMB, Doc. 37, *Order of Dismissal* (Bankr. N.D. Ga. Feb. 2, 2017).

[11] *In re Harrison*, Case No.: 17-62962-PMB, Doc. 57, *Order of Dismissal* (Bankr. N.D. Ga. Dec. 7, 2017).

[12] *In re Harrison*, Case No.: 16-68804-PMB, Doc. 39, *Chapter 13 Standing Trustee's Final Report and Account* (Bankr. N.D. Ga. Apr. 3, 2017); *In re Harrison*, Case No.: 17-62962-PMB, Doc. 60, *Chapter 13 Standing Trustee's Final Report and Account* (Bankr. N.D. Ga. Feb. 26, 2018).

[13] *See* Proof of Claim 1-1, pp. 5-11.

[14] *Motion to Extend Stay* (Docs. 5 and 7); *Order and Notice of Hearing* (Doc. 9).

objection to the motion to extend stay on April 10, 2018 and argued against the motion at the April 12 hearing. Based on Debtor's testimony at that hearing the Court overruled Deltona's objection and entered an order extending the stay for an additional sixty (60) days.[15]

Debtor filed a Chapter 13 plan on April 20, 2018.[16]  From that date through June 14, 2018, when Debtor filed the Sanctions Motion, the record activity in this case was routine.

In response to the Sanctions Motion and OTSC, Deltona conceded that it violated the stay by continuing with the foreclosure sale. Its bankruptcy counsel argued that this stay violation was not willful and should not be sanctioned because Deltona's state court attorney made a mistake of law.[17]  Neither Deltona nor its bankruptcy counsel took any action at this time to vacate the foreclosure sale.

## A. Deltona's stay violations.

Immediately after filing this case Debtor drove from Tallahassee to Washington County, Florida, where she delivered copies of her Chapter 13 petition to Deltona's state court counsel and the Washington County

---

[15] Doc. 56.
[16] Doc. 53.
[17] Doc. 97.

Clerk of Court,[18] and advised them verbally and via email that she had filed this case and that the automatic stay was in place.[19]

### 1. The foreclosure sale.

The next day, March 27, 2018, Debtor waited in the lobby of the Washington County Clerk's office before the scheduled foreclosure sale where she tried, to no avail, to convince Deputy Clerk Donjuan to cancel the sale. Deputy Clerk Donjuan told Debtor that she had to bring the issue to the attention of the presiding judge, so Debtor went to the Circuit Judge's chambers.  Meanwhile, Deltona's state court counsel convinced the Washington County Clerk of Court to disregard Debtor's urgings that the sale was stayed, so the Clerk conducted the sale in Debtor's absence. Deltona was the "successful" and only bidder. Debtor testified that when she returned to the Clerk's office and was told the sale had taken place she sat there and cried because she believed she had done all she could to stop the sale.[20]

Deltona called Deputy Clerk Donjuan to testify on its behalf at the Final Hearing. In describing her interactions with Debtor, Deputy Clerk

---

[18] *See* Doc. 183, pp. 15-17 (Trial Tr. 24:4-30:20, July 16, 2018).
[19] *Ibid.*
[20] *Id.* at p. 17 (Trial Tr. 31:6-20, July 16, 2018).

Donjuan: did not deny, but could not recall, telling Debtor to go to the presiding judge's chambers to try to stop the sale; conceded that Debtor was upset but did not recall Debtor crying; and admitted that after the foreclosure sale Debtor repeatedly declared that it was not right that the Clerk went through with foreclosure.

In an apparent attempt to discredit some of Debtor's testimony, Deltona introduced into evidence and played a portion of the security camera video of the Washington County Clerk of Court's lobby before, during, and after the foreclosure sale.[21] That video shows:

> Debtor enters the Clerk's office lobby before the scheduled time for the foreclosure sale, walks over to Deputy Clerk Donjuan, and shows her some documents.[22] After roughly one minute of conversation, Deputy Clerk Donjuan exits the room. During Deputy Clerk Donjuan's absence, Debtor is shaking her head, pacing constantly, and peering out of the window.[23] Debtor then exits the lobby.[24] Approximately two minutes later Deputy Clerk Donjuan returns, then leaves the lobby again, and returns.[25] The sale then occurs with Debtor not present. Debtor returns to the Clerk's office lobby after the sale, and speaks with and shows documents to Deputy Clerk Donjuan.[26] Deputy Clerk Donjuan then exits for the final time.[27] At this point, Debtor is visibly upset: throwing her head back, shaking

---

[21] Foreclosure Sale Video Ex. 51.
[22] *Id.* at 3:39-4:27.
[23] *Id.* at 4:31-6:14.
[24] *Id.* at 6:16.
[25] *Id.* at 8:35; 9:44; and 10:17.
[26] *Id.* at 11:24.
[27] *Id.* at 12:02.

her head, walking in circles around the lobby, and appearing to try to speak to a Clerk's Office employee seated in a bank teller style window.[28]

## 2. Deltona's continuous possession of, and actions to prevent Debtor from accessing, the Chipley Property for approximately ninety-four (94) days post-petition.

Ten (10) days after the foreclosure sale the Washington County Clerk of Court issued a certificate of title to the Chipley Property to Deltona. On the same day, Deltona's bankruptcy counsel filed their first Notice of Appearance in this case.[29] Deltona then had its employee change the locks and put up "no trespassing" signs on the home. Meanwhile, Debtor continued contacting Deltona's bankruptcy counsel, complaining about the sale in violation of the stay.

Debtor remained locked out of the Chipley Property from March 27 through June 29, 2018.   This lockout ended the day after the initial OTSC Hearing at which Deltona and its bankruptcy counsel finally admitted in open court that Debtor had no access to the Chipley Property and agreed to give her a set of keys.

---

[28] *Id.* at 12:12-15:00; 15:04-16:08; and 16:29-16:37. Deltona argues that one cannot see Debtor actually "cry" in the lobby after the sale. Regardless, the video provided irrefutable proof of Deltona's willful stay violation and the emotional distress Debtor experienced as a result. Additionally, the Court believes Debtor's testimony that Deputy Clerk Donjuan sent her to the presiding judge's chambers to try to stop the sale.
[29] Doc. 32.

### 3. Damage to the Chipley Property.

Deltona turned off the utilities after evicting a third-party tenant and left the Chipley Property vacant and without air conditioning for a considerable period. After Deltona admitted to the stay violations and gave Debtor access to the Chipley Property, Debtor traveled to the Chipley Property often, sleeping in her car or staying with a friend or relative.[30] Upon assessing the damage, which she testified was extensive, Debtor began repairs including painting and replacing flooring.[31]

Deltona called Mr. Worthington, denominated as its "man on the ground," to testify on its behalf. After the foreclosure sale, Mr. Worthington went to the Chipley Property, drilled out the lock and deadbolt, and placed a new handle set on the front door. He testified that the front door to the house and the garage door were damaged.[32]

---

[30] Doc. 149, p. 6 n.12. Debtor testified that she was working in Georgia and sleeping on her uncle's couch.

[31] Debtor's testimony that Deltona damaged the Chipley Property by turning off the power and leaving it unairconditioned for several months was credible and unrefuted.

[32] According to Mr. Worthington, in January of 2016 Deltona had a Receiver appointed to take over the Chipley Property; the Receiver evicted a third-party tenant. Doc. 134-7, pp. 45-52. Afterwards, Mr. Worthington, who oversaw Deltona's tenant removal process and cleanup, went to the Chipley Property at Deltona's request to assess damages the third-party tenant had caused. This is when Mr. Worthington removed Debtor's mailbox which, he testified, was damaged.

### 4. Deltona's harassment and stalking of Debtor.

Debtor testified that during her trips to the Chipley Property she saw Mr. Worthington drive by numerous times. On cross-examination Debtor asked Mr. Worthington if he had been "stalking" her. Visibly displeased with that question, Mr. Worthington insisted that he had never "stalked" Debtor. But, on further questioning Mr. Worthington admitted that even after Deltona gave Debtor access to the Chipley Property in late June, at Deltona's request he went by on numerous occasions to see if the house was being disturbed and to note if anyone was there.  This testimony is consistent with testimony given by Tracy Williams, Deltona's Assistant Treasurer, at the OTSC Hearing:

> [Mr. Worthington is] our on-site employee who does maintenance on our rentals and our inventory houses . . . I believe on almost a daily basis since May 1 [Mr. Worthington has driven by the house] . . . 72 times . . . .[33]

Ms. Williams calculated that of these seventy-two (72) trips, thirteen (13) took place after Deltona finally gave Debtor access to the Chipley property.[34]

---

[33] Doc. 183, pp. 26-27 (Trial Tr. 68:22-70:16, July 16, 2018).
[34] *Id.* at p. 27 (Trial Tr. 72:21-73:6, July 16, 2018).

### 5. Debtor's late-night confrontation with law enforcement at the Chipley Property.

Deltona called Deputy Sheriff Landon Fries to testify on its behalf at the Final Hearing. According to Deputy Fries, one evening in late June of 2018, his dispatcher sent him to the Chipley Property as a result of a report that a suspicious person was on the premises of a "foreclosed property."[35] According to Deputy Fries, upon arrival at the Chipley Property he pulled into Debtor's driveway at a "normal" rate of speed with his headlights, not his emergency lights, on. Deputy Fries asked Debtor for identification and what business she had on the property; he denied that he drew his weapon. According to Deputy Fries, once he verified that Debtor's driver's license address matched that of the Chipley Property, he left.

Debtor recalled this incident differently. According to Debtor, she and her 62-year old mother were in the driveway unloading groceries after dark when a law enforcement officer pulled very quickly into the driveway with his "lights" on, and got out of his car with his flashlight in

---

[35] Based on Deputy Fries' testimony, it appears this incident took place on the same day that Deltona gave Debtor keys to the property. Deputy Fries testified that he did not know who called the Sheriff's office.

her face.[36] Debtor testified that the officer had his gun drawn, accused her and her mother of breaking and entering, required her to show proof of ownership of the property, and accused her of kicking down the front door to the home.[37] Debtor described Deputy Fries as confrontational and this incident as extremely distressing to both her and her mother. She testified that at the time she believed that she "could have been killed" at her own home.[38]

## B. Deltona's bankruptcy counsel's actions during this case.

The post-petition foreclosure sale by Deltona was bad enough; what Deltona's bankruptcy counsel did after that shocks the conscience.

### 1. Deltona's bankruptcy counsel ignored Debtor's legitimate complaints that Deltona had violated the stay.

Within four (4) days of the foreclosure sale, Debtor called and spoke with one of Deltona's bankruptcy counsel, H. Matthew Fuqua. According to Debtor, Mr. Fuqua did not acknowledge that Deltona had violated the automatic stay nor did he offer to correct the situation.[39]

---

[36] Doc. 183, p. 18 (Trial Tr. 36:21-37:4, July 16, 2018).
[37] *Id.* at p. 19 (Trial Tr. 37:1-39:12, July 16, 2018).
[38] *Id.* at p. 13 (Trial Tr. 14:9-14, July 16, 2018).
[39] *Id.* at p. 17 (Trial Tr. 33:7-17, July 16, 2018).

### 2. Deltona's bankruptcy counsel made misleading and false representations to this Court.

When Deltona opposed Debtor's motion to extend the automatic stay, its bankruptcy counsel did not advise the Court, in writing or at the hearing, that the sale had already taken place or that Deltona had locked Debtor out of the Chipley Property. Instead, Deltona's bankruptcy counsel wrote that Deltona sought to "proceed" with the foreclosure:

> [I]t is the Debtor's sole intention in filing bankruptcy to frustrate Deltona's right to foreclose on the Debtor's property in Washington County, Florida and to delay and impede Deltona's *right to proceed with* its State Court right to relief.
> . . .
> Debtor's sole intention in filing for bankruptcy relief is to unfairly thwart Deltona's *efforts to proceed with* its foreclosure case.[40]

Rather than inform the Court of the highly relevant fact that Deltona had completed the sale post-petition, Deltona's bankruptcy counsel argued: 1) that the stay should not be extended because Debtor filed this case in bad faith; and, 2) alternatively, that there was no stay. In support of this second argument, Deltona's bankruptcy counsel wrote:

> The Order granting Deltona relief from stay entered in the [Second Georgia Case] was granted pursuant to the provisions of 11 U.S.C. § 362(d)(4) [*sic*] and the current

---

[40] Doc. 42, pp. 2 and 4 (emphasis added).

proceedings [*sic*] were filed within 2 years after the date of entry of such order. As such, the automatic stay imposed by 11 U.S.C. § 362(a) [*sic*] upon the filing of the current proceedings [*sic*] was annulled and there is not currently an automatic stay in place that would prohibit Deltona from proceeding with its *In Rem* [*sic*] foreclosure action against the Debtor's real property located in Washington County, Florida.[41]

Every fact stated in the above paragraph is false. The truth is that in the motion it filed in the Second Georgia Case Deltona did not request, or even mention, prospective stay relief or § 362(d)(4). Rather, in that motion Deltona requested ordinary stay relief by asserting lack of equity and that the Chipley Property was not necessary to an effective reorganization.[42] Similarly, the order entered by the Georgia bankruptcy court contains no mention of prospective stay relief or § 362(d)(4); it simply granted Deltona relief from the stay "to proceed with" foreclosure.[43]

### 3. Deltona's bankruptcy counsel advocated positions unsubstantiated by law.

As an "affirmative defense" to the OTSC and Sanctions Motion, Deltona alleged that the stay should be annulled because Debtor filed

---

[41] *Id.* at pp. 3-4.

[42] *Id.* at pp. 8-12.

[43] *Id.* at pp. 39-42. When the Georgia bankruptcy court entered this order, the term "proceed" was accurate because Deltona had not yet obtained a final judgment of foreclosure.

bankruptcy in bad faith.[44] That "affirmative defense" not only admitted that the stay was in effect, a position contrary to that argued in Deltona's earlier objection to Debtor's motion to extend the stay, it was procedurally improper. A request to annul the stay must be made by motion.[45]

Rather than address the real issues, which were whether Deltona violated the stay and whether its violations were willful, at the OTSC Hearing Deltona's bankruptcy counsel engaged in a line of questioning designed to prove that the Chipley Property was not Debtor's homestead.[46] But, whether property is homestead is wholly irrelevant to whether a willful stay violation occurred.

Deltona's bankruptcy counsel made no attempt to vacate the foreclosure sale until forced to do so. Even after Debtor finally brought the stay violations to light, rather than take appropriate action in the state court to vacate the sale and certificate of title Deltona's bankruptcy counsel requested that this Court do so. That this was inappropriate is

---

[44] Doc. 137, p. 3; Doc. 183, p. 31 (Trial Tr. 88:3-22, July 16, 2018).

[45] Fed. R. Bankr. P. 9014(a) made applicable by Fed. R. Bankr. P. 4001(a)(1).

[46] Doc. 183, p. 13 (Trial Tr. 16:3-22, July 16, 2018); *Id.* at pp. 20-21 (Trial Tr. 44:21-46:23, July 16, 2018).

beyond question.[47] It is well-settled that bankruptcy courts are to give state court judgments full faith and credit, and that the *Rooker-Feldman* doctrine precludes a challenge in federal court to the validity of a state court judgment.[48]

# DISCUSSION

## A. Contempt is the appropriate remedy for willful violations of the automatic stay.

The automatic stay of 11 U.S.C. § 362(a) is a lynchpin of bankruptcy, designed as a reprieve to debtors that file for relief. As its name implies, the stay is automatic.[49] Violations of the automatic stay are punishable as contempt because the automatic stay is considered equivalent to a court order. If the conduct is willful, even if based upon advice of counsel, contempt is an appropriate remedy.[50]

> When a violation of the stay is inadvertent, contempt is not an appropriate remedy. Nevertheless, the creditor has a duty to undo actions taken in violation of the automatic

---

[47] The Court struck this request as "improper." Doc. 128.

[48] *In re Bertram,* 746 Fed. Appx. 943, 948-9 (11th Cir. 2018); *In re Heuser*, 127 B.R. 895, 897 (Bankr. N.D. Fla. 1991)(citing *In re Byard*, 47 B.R. 700, 701 (Bankr. M.D. Tenn. 1985) "a federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").

[49] "The stay springs into being immediately upon the filing of a bankruptcy petition: '[b]ecause the automatic stay is exactly what the name implies-'automatic'- it operates without the necessity for judicial intervention.'" *In re Soares*, 107 F. 3d 969, 974 (1st Cir. 1997) (citing *Sunshine Dev., Inc. v. FDIC*, 33 F.3d 106, 113 (1st Cir. 1994)).

[50] 3 Collier on Bankruptcy P 362.12 (16th ed. 2018).

stay. Failure to undo a technical violation may elevate the violation to a willful one.[51]

The debtor has the burden to establish that a violation of the automatic stay occurred and was "willful."[52] In the Eleventh Circuit, a violation of the stay is willful if the offending party "(1) knew the automatic stay was invoked and (2) intended the actions which violated the stay."[53] Deltona's (or its state court counsel's) subjective belief that the stay might not apply is irrelevant.[54] It is sufficient that the parties had actual knowledge of the bankruptcy case.[55] Bankruptcy courts within the Eleventh Circuit have held that the failure to take affirmative action to stop a stay violation is itself a violation of the automatic stay subject to sanctions under 11 U.S.C. § 362(k).[56]

---

[51] *Ibid.*

[52] *See In re Hardy*, 97 F.3d 1384, 1390 (11th Cir. 1996).

[53] *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1555 (11th Cir. 1996).

[54] *Id.* (citing *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir. 1990)).

[55] *Randolph v. IMBS, Inc.*, 368 F.3d 726, 728 (7th Cir. 2004).

[56] *In re Taylor*, 190 B.R. 459, 461 (Bankr. S.D. Fla. 1995); *In re Parker,* Case No.: 12-11502-WRS, 2014 WL 2800754, at *2 (Bankr. M.D. Ala. Feb. 11, 2014), *aff'd in part, vacated in part sub nom. Parker v. Credit Cent. S., Inc.*, Case No.: 1:14-CV-311-WKW, 2015 WL 1042793 (M.D. Ala. Mar. 10, 2015), *aff'd sub nom. In re Parker*, 634 Fed. Appx. 770 (11th Cir. 2015); *In re Roche,* 361 B.R. 615, 621 (Bankr. N.D. Ga. 2005) (stating that that a creditor may not sit on its hands and permit a stay violation to occur); *In re Caffey,* 384 B.R. 297, 307 (Bankr. S.D. Ala. 2008) ("The creditor should not be allowed to then sit back and 'choose to do nothing and pass the buck to the debtor' to stop the process").

### 1. Deltona's initial and continuing stay violations were willful.

Deltona does not dispute finalizing the foreclosure sale in violation of the stay and with knowledge of Debtor's bankruptcy petition. Had Deltona's bankruptcy counsel admitted this stay violation when they entered their appearance and taken immediate steps to correct it, the Court may never have become involved in awarding sanctions. Instead, Deltona would have been forced to give Debtor access to her property or seek immediate relief from stay.

But neither Deltona nor its bankruptcy counsel confessed to the initial stay violation.  Instead, they chose to hide the foreclosure sale and enable Deltona to continue the stay violations for at least ninety-four (94) days post-petition.

As the old saying goes, actions speak louder than words. Deltona's continuing stay violations were deliberate and intentional. These stay violations continued with assistance of bankruptcy counsel until Debtor, a self-represented party, filed the Sanctions Motion and brought them to the Court's attention. Ample evidence shows that Deltona's and its bankruptcy counsel's stay violations were willful, and that Debtor suffered emotional distress as a result.

## 2. Deltona's bankruptcy counsel willfully violated the automatic stay.

Immediately upon appearing for Deltona eleven (11) days into this case, Deltona's bankruptcy counsel knew that there was an automatic stay in place and that their client had violated the stay by proceeding with the foreclosure sale. At the OTSC Hearing, Debtor testified that after she saw the "no trespassing" signs she spoke with both of Deltona's bankruptcy counsel, Mr. Milton and Mr. Fuqua:

> I was just floored. . . what was heart wrenching for me is that in all my deliberations with Mr. Fuqua and mister— [presumably Mr. Milton]. . . I made them aware of the fact that they knew I had a stay, they did nothing. . . . I spoke to Mr. Fuqua on that day [four days after the sale] and I told him in no uncertain terms that they violated the stay, and his response was *why do you want that house anyway.* . . ."[57]

When Messrs. Fuqua and Milton still did nothing to remedy the stay violations, Debtor testified:

> I realized the only way then was to move the court to sanction them. Because I was hoping in good faith they would have realized that they violated the stay, more so because [the court] had extended the stay.[58]

Neither Mr. Milton nor Mr. Fuqua have disputed this testimony.

---

[57] Doc. 183, p. 17 (Trial Tr. 33:7-17, July 16, 2018) (emphasis added).
[58] *Id.* at p. 18 (Trial Tr. 35:3-12, July 16, 2018).

In the objection to Debtor's motion to extend the automatic stay filed shortly after this case began, Deltona's bankruptcy counsel listed notable events regarding Debtor's prior bankruptcy cases and the Chipley Property but failed to include the most notable of all: the post-petition sale in violation of the automatic stay.[59] Instead, Deltona's bankruptcy counsel waited approximately eighty-two (82) days from filing their first Notice of Appearance in this case to admit, or even mention, Deltona's initial stay violation. That admission finally came only in response to Debtor's Sanctions Motion.

Violations of the automatic stay become willful when counsel, upon learning of the bankruptcy filing, fails to act to undo the stay violation.[60] In *In re Taylor,* a creditor's attorney caused a default final judgment to be entered against the debtor post-petition in violation of the automatic stay.[61] The debtor's bankruptcy lawyer wrote and called the creditor's lawyer to request that he move to vacate the default judgment; he refused.[62] In awarding attorneys' fees as a sanction against the creditor's

---

[59] Doc. 42.

[60] *In re Taylor,* 190 B.R. 459 (Bankr. S.D. Fla. 1995). *See also, In re Parker*, 2014 WL 2800754, at *3 (citation omitted).

[61] *In re Taylor,* 190 B.R. at 460 (Bankr. S.D. Fla. 1995).

[62] *Ibid.*

lawyer, the bankruptcy court stated: "If one is enjoined from continuing an action then a person is required to take steps to discontinue such action."[63]

Like the attorney in *Taylor,* Deltona's bankruptcy counsel had an affirmative duty to restore the pre-petition status quo by taking immediate action to undo the foreclosure sale. Rather than do so, Deltona's bankruptcy counsel facilitated Deltona's continuing stay violations with false and misleading representations. Even after Debtor brought the numerous stay violations to the Court's attention, neither Deltona nor its bankruptcy counsel showed remorse or made any real attempt to rectify the situation. This Court has ample evidence on which to find that Deltona's bankruptcy counsel's stay violations were willful, and that under the provisions of 11 U.S.C. § 362(k), Debtor is entitled to an award of damages against them.

---

[63] *Id.* at 461 (citing *In re Elder,* 12 B.R. 491 (Bankr. M.D. Ga. 1981), in which a continuing writ of garnishment had been entered pre-petition, the *Taylor* court stated: "[d]espite notice of the bankruptcy case, the garnishee continued to withhold a portion of the Debtor's pay check and the creditor failed to take any action to stop the garnishment. The court held that everyone who had notice of the pending bankruptcy, including the officials of the state court such as clerks, marshals and sheriffs had an obligation to stop the proceeding upon having notice. As a result of the failure to take affirmative action to stop the 'snowball' effect of the garnishment both the creditor and garnishee were subjected to sanctions for violation of the automatic stay.").

### B. Debtor is entitled to compensatory damages, including damages for emotional distress, and punitive damages.

Bankruptcy Code Section 362(k)(1) provides that "an individual injured by any willful violation of a stay . . . *shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[64]

The evidence presented at the Final Hearing proves that Deltona and its bankruptcy counsel consistently acted with actual knowledge that they were violating a federally protected right, such that it is appropriate to impose compensatory damages, including damages for emotional distress, and punitive damages.[65] The evidence also shows that Deltona and its bankruptcy counsel acted with "willful disrespect" and in "arrogant defiance of the bankruptcy laws" during this case, sufficient to warrant awarding additional damages against them all.[66]

The next task is to determine the types and amounts of damages the Court should award.

---

[64] 11 U.S.C. § 362(k)(2018) (emphasis added).
[65] *In re Wagner*, 74 B.R. 898, 903-4 (Bankr. E.D. Pa. 1987).
[66] *In re Johnson*, Case No.: 06-00164, 2007 WL 2274715, at *10 (Bankr. N.D. Ala. Aug. 7, 2007).

### 1. Compensatory damages.

In testimony and in her itemized statement of claims Debtor generally described the types of out-of-pocket damages for which she seeks compensation, including travel expenses, changing locks, and replacing the mailbox.[67] As to items on her itemized statement, Debtor admits that she did not purchase the items but that the amounts listed represent "true market value costs for purchase of the said items."[68]

The only documentary proof of actual, compensatory damages that Debtor provided is a $300.00 receipt for yard work she had done after the foreclosure sale.[69] In addition, Mr. Worthington testified that to replace the lock that Deltona drilled would cost $100.00. Debtor is thus entitled to $400.00 in compensatory damages.[70] The Court next turns to the award of compensatory damages for emotional distress.

### 2. Emotional distress damages.

A bankruptcy court may award emotional distress damages without supporting medical evidence or testimony where the stay violations are

---

[67] Doc. 181.
[68] Doc. 182.
[69] Doc. 181, p. 18.
[70] At the Final Hearing, the Court announced that Debtor was entitled to compensatory damages in the amount of $460, made up of $360 for yard work and $100 for the lock replacement. The yard work receipt was for $300, not $360. *Ibid.*

"patently egregious."[71] The Eleventh Circuit has held that while the term "actual damages" in section 362(k) is inclusive of emotional distress damages,

> at a minimum, to recover "actual" damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between the significant emotional distress and the violation of the automatic stay.[72]
> . . .
> "Fleeting or trivial anxiety or distress" is not "significant" emotional distress.[73]

In *Lodge v. Kondaur Capital Corp.,* the debtor filed a Chapter 13 petition and the mortgage creditor filed a motion for relief from stay; the bankruptcy court never ruled on that motion.[74] Without having obtained stay relief, the mortgage creditor published a notice of foreclosure sale in the local newspaper.[75] Although the debtor and his wife did not see the

---

[71] *In re Lansaw,* 853 F.3d 657, 669 (3d Cir. 2017), *cert. denied sub nom. Zokaites v. Lansaw,* 138 S. Ct. 1001 (2018);*See also, In re Odom,* 570 B.R. 718, 724 (Bankr. E.D. Pa. 2017); and *In re Vu,* 591 B.R. 596, 605-06 (Bankr. E.D. Pa. 2018). Deltona originally argued that this Court cannot award emotional distress damages without medical evidence, so the Court ordered Deltona to brief that issue. In its briefing, Deltona wrote: "Deltona will not attempt to readdress [whether medical testimony is required] and concedes the Court's interpretation of the law is correct on this point." Doc. 165, p. 1.

[72] *Lodge v. Kondaur Capital Corp.,* 750 F.3d 1263, 1271 (11th Cir. 2014) (citing *In re Dawson,* 390 F.3d 1139, 1149 (9th Cir. 2004)).

[73] *Id.* at 1272.

[74] *Id.* at 1265. That creditor then assigned the mortgage to a third party, which filed an amendment to the stay relief motion; the bankruptcy court never ruled on the amended motion either.

[75] *Ibid.*

publication, they received letters from law firms advising them that they were "about to be foreclosed;" a few weeks later, the debtor and his wife learned that the foreclosure sale had been canceled.[76] After the debtor completed his Chapter 13 plan and received his discharge, he and his wife sued for willful violations of the automatic stay and sought emotional distress damages.[77] The bankruptcy court's denial of the Lodges' request for emotional distress damages was upheld on appeal, primarily on the basis that "generalized evidence, without any additional specific detail," did not show significant emotional distress due to a notice of sale being published for a single day.[78]

Unlike the debtor in *Lodge,* Debtor here has met her burden to prove, with specific detail, entitlement to damages for emotional distress. The best evidence is the video. The next best evidence is Debtor's testimony and the corroborating testimony of Deltona's witnesses. For approximately three months during which Debtor should have been protected by the Bankruptcy Code, Deltona kept her locked out, prevented her from receiving mail at her property, had its employee stalk

---

[76] *Ibid.*
[77] *Id.* at 1265-6.
[78] *Id.* at 1272.

her, and reported the property as "foreclosed," thus setting the stage for an after-dark confrontation with law enforcement. It is hardly shocking that as a result Debtor was traumatized and felt anxious, helpless, unsafe, threatened, and paranoid. The anxiety and distress caused by Deltona's actions were neither fleeting nor trivial. The facts support an award of emotional distress damages. Debtor, a non-attorney, knew that the automatic stay should have stopped the foreclosure sale and prevented Deltona from taking over possession of the Chipley Property. Yet despite her best efforts she could not persuade Deltona, or its bankruptcy counsel, to stop violating the stay.[79] This is appalling and without question contributed to Debtor's emotional distress.

### 3. Punitive damages are warranted against Deltona and its bankruptcy counsel.

The Bankruptcy Code permits courts to assess punitive damages to redress willful violations of the automatic stay in "appropriate circumstances."[80] The term "appropriate circumstances" has been

---

[79] Doc. 183, p. 18 (Trial Tr. 35:3-12, July 16, 2018); *see also,* Doc. 132, p. 18 (emails between Debtor and Deltona's bankruptcy counsel in which Debtor informed Mr. Milton that she had been locked out of the Chipley Property since March 27 through and including June 1, that she had been forced to sleep in her car, and that she did not wish to be "continually bullied and intimidated." Mr. Milton's response was "[t]hank you for taking my call this afternoon. . . .").

[80] 11 U.S.C. § 362(k)(1)(2018); *In re Campbell,* 553 B.R. 448, 456 (Bankr. M.D. Ala. 2016).

construed to require that the violator's acts be "egregious, vindictive, malicious, or accompanied by bad faith."[81] Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor."[82] All five factors support awarding punitive damages against Deltona and its bankruptcy counsel for their outrageous conduct.

### a.  Punitive damages against Deltona.

Factor (1): Deltona's conduct was calculated and deliberate. As discussed in depth above, Deltona knew Debtor filed bankruptcy the day before the foreclosure sale. While Deltona's initial stay violation may have been due to its state court lawyer's error of law, there is no excuse for Deltona's actions after the sale.

Factor (2): The nature and extent of the harm to Debtor.  Deltona's intentional conduct cost Debtor money, damaged the Chipley Property

---

[81] *Id.* (quoting *In re Hutchings*, 348 B.R. 847, 913 (Bankr. N.D. Ala. 2006)).

[82] *Parker v. Credit Cent. S., Inc.,* 2015 WL 1042793 at *9  (citing to *In re Castillo*, 456 B.R. 719, 727 (Bankr. N.D. Ga. 2011)); *see also, In re White*, 410 B.R. 322, 327 (Bankr. M.D. Fla. 2009); and *In re Roche*, 361 B.R. 615, 624 (Bankr. N. D. Ga. 2005). *See also, In re Campbell*, 553 B.R. at 456.

and, most significantly, directly and proximately caused Debtor significant emotional distress.

Factor (3): Deltona's ability to pay. The Court did not take evidence of Deltona's financial capabilities. But, based solely on Deltona's status as a developer, and the amount Deltona has undoubtedly paid for legal services in this and Debtor's prior two bankruptcy cases for filing pleadings, taking discovery, and appearing at hearings, including a day-long trial, it is reasonable to conclude that Deltona can afford to pay the punitive damages being awarded. Deltona has offered no proof or argument to the contrary.

Factor (4): Deltona's motives. The only motive Deltona admits is a desire to complete the foreclosure. But Deltona's actions reveal a more sinister motive: winning at all costs, with no regard for the Bankruptcy Code, this Court, or the rights of its customer, the Debtor.

Factor (5): Provocation by the Debtor. Debtor's only "provocation" has been to file more than one bankruptcy case in her effort to save the Chipley Property from foreclosure. The Bankruptcy Code does not prohibit, but rather anticipates, multiple bankruptcy filings.

### b. Punitive damages need not be limited to a single-digit multiplier of actual damages.

Deltona erroneously argues that punitive damages must be limited to a single-digit multiplier of actual damages. In support of this argument Deltona relies on *Exxon Shipping Co. v. Baker*.[83] But in *Baker* the Supreme Court held that a "single-digit ratio" between punitive and compensatory damages is constitutional; the Court did not hold, as Deltona argues, that awards in excess of single-digit ratios are improper.[84]

Deltona also cites *In re Escobedo* in support of its argument that punitive damages must be limited to a single-digit multiplier.[85] But *Escobedo* does not support Deltona's argument, either. In *Escobedo,* the bankruptcy court awarded punitive damages equal to a multiplier of .6.[86] In so doing, the court first decided how much to award in punitive

---

[83] Doc. 152; *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

[84] *Id.* at 525. *See also, State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003) ("[s]ingle digit multipliers are more likely to comport with due process . . . ."). In a recent opinion, the Eleventh Circuit discussed the "single-digit ratio" precedent of *State Farm Mut. Auto. Ins. Co.* and noted that single-digit multipliers are more likely to be found constitutional. *McGinnis v. American Home Mortgage Servicing, Inc.,* 901 F.3d 1282, 1290 (11th Cir. 2018). In the same case, the Eleventh Circuit held that emotional distress damages are to be included in actual damages for purposes of the punitive damages multiplier. *Ibid.*

[85] *In re Escobedo*, 513 B.R. 605 (Bankr. D.N.M. 2014).

[86] *Id.* at 614.

damages; it then determined that the punitive damage multiplier was appropriate under Supreme Court precedent.[87]

### c. Deltona is not entitled to setoff damages awarded for its bad conduct against the amount Debtor owes on the FJ.

Deltona claims that it can set off any damages this Court awards to Debtor against the amount Debtor owes on the FJ. This Court disagrees. First, the bankruptcy case on which Deltona relies involved recoupment under Alabama law, not setoff.[88] Secondly, in order to be entitled to setoff, there must be mutuality.[89] There is no mutuality between what Debtor owes Deltona on account of the FJ and the damages being awarded for Deltona's willful violations of the automatic stay.

Even if Deltona could prove mutuality, equitable principles preclude setoff. As one court held in denying a creditor's request for setoff against damages awarded for its bad faith filing of an involuntary bankruptcy petition:

---

[87] *Ibid.*

[88] *In re Cox*, 214 B.R. 635 (Bankr. N.D. Ala. 1997).

[89] "[T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . ." 11 U.S.C. § 553(a)(2018); *In re Patterson*, 967 F. 2d 505, 509 (11th Cir. 1992) ("Section 553 requires that the obligation between the debtor and creditor arose before filing the bankruptcy petition and that mutuality of obligation exists.").

Setoff may be denied "where the creditor has committed inequitable, illegal or fraudulent acts, or the application of setoff would violate public policy."

. . .

[T]he Court is unaware of . . . any authority in which a court allowed a creditor to setoff a judgment that was based on a finding of bad faith.[90]

Deltona must pay for its bad faith conduct and is not entitled to set off the damages being awarded to Debtor against the amounts Debtor owes on account of the FJ.[91]

### d. Punitive damages against Deltona's bankruptcy counsel.

Sanctions in the form of punitive damages are appropriate to punish Deltona's bankruptcy counsel for enabling and participating in Deltona's bad conduct. Deltona's bankruptcy counsel's conduct was deliberate. Deltona's bankruptcy counsel never admitted or reported to the Court that the foreclosure sale had taken place and that Deltona was keeping Debtor locked out of the Chipley Property until Debtor forced their hand by filing the Sanctions Motion. Deltona's bankruptcy counsel's

---

[90] *U.S. Bank, Nat'l. Ass'n. v. Rosenberg,* 581 B.R. 424, 430 (E.D. Pa. 2018).

[91] It is possible that Deltona continued its willful stay violations because its management and attorneys were convinced that Debtor's actual damages would be minimal. This type of thinking led to a punitive damage award in *In re Brodgen*, 588 B.R. 625 (Bankr. M.D. Ala. 2018), where a creditor knew it was violating the automatic stay but went ahead with the repossession of the debtor's vehicle anyway because it "calculate[d] that it [was] in its best interests, economically, to violate [the stay]." *Id.* at 631. The court found that punitive damages were necessary in order to deter future violations. *Ibid.*

cavalier attitude toward Debtor, this Court, and indeed the entire bankruptcy system exacerbated, if not caused, Debtor's emotional distress.

The only discernable motive behind Deltona's bankruptcy counsel's behavior is identical to Deltona's: to win at all cost. Such a motive, and the behavior employed to accomplish it, especially from officers of the court, is reprehensible.

Courts faced with similar behavior have imposed sanctions and punitive damages. In *In re Campbell,* an attorney willfully violated the automatic stay "multiple times" so the bankruptcy court awarded $50,000 in punitive damages to prevent the attorney from engaging in the same type of conduct in the future.[92] The court emphasized that the award was because the attorney "undoubtedly" knew what conduct the automatic stay prohibits, "yet he chose to engage in that conduct anyway."[93] That philosophy is entirely appropriate here.

In a case that originated in the Bankruptcy Court for the Southern District of Alabama, an attorney violated the automatic stay by filing a civil suit against the debtor post-petition, without first obtaining stay

---

[92] *In re Campbell,* 553 B.R. 448, 456-7 (Bankr. M.D. Ala. 2016).
[93] *Id.* at 457.

relief and with knowledge that the debtor had filed a Chapter 7 petition.[94]

The attorney refused to voluntarily dismiss the action for approximately

222 days, even after the debtor's attorney demanded that she do so.[95]

After an evidentiary hearing, the bankruptcy court awarded the debtor

and his non-debtor spouse (the "Hornes") $30,000 in actual damages for

emotional distress, plus $5,000 in punitive damages, and attorneys'

fees.[96]   The attorney appealed.   The district court affirmed and awarded

the Hornes additional attorneys' fees for defending the appeal of the

damages award.[97] Additional appeals and cross appeals ensued, causing

the Hornes' attorney's fees to mount.[98] Ultimately, the district court

awarded the Hornes appellate fees and costs of $92,495.86, finding that

while the amount was large, the award was reasonable given the nature

of the litigation and the time, skill and labor required to defend the

---

[94] *In re Horne*, 876 F.3d 1076, 1079 (11th Cir. 2017).
[95] *In re Horne*, Case No.: 11-00096, Doc. 352, *Transcript* (Bankr. S.D. Ala. Jan. 24, 2013).
[96] *Id.*
[97] *In re Horne*, 876 F.3d at 1079.
[98] The history of this case is lengthy. After losing her appeal of the sanctions award, the attorney attempted to have the bankruptcy judge recused from the case. *Ibid.* That recusal motion was denied, and the attorney appealed that decision as well. After various additional appeals and cross-appeals, ultimately the Eleventh Circuit affirmed that the bankruptcy judge's recusal was not required and remanded to the district court to determine whether the Hornes were entitled to additional attorneys' fees under Section 362(k) for having to battle the recusal. *Ibid.* On remand, the district court awarded an additional $14,918.60 in attorneys' fees. *Ibid.* The lawyer petitioned for a writ of certiorari with the U.S. Supreme Court, which was denied. *Mantiply v. Horne*, 136 S. Ct. 2512 (2016).

numerous appeals.[99] Not surprisingly, the lawyer again appealed.  The Eleventh Circuit again affirmed, holding that the Hornes were entitled to attorney's fees incurred defending the various appeals because the cases all related to the attorney's willful violation of the automatic stay.[100]

This Court's opinion of the conduct of Deltona's bankruptcy counsel is synonymous with the bankruptcy judge's remark about the offending attorney in *In re Horne*: "the facts reveal an attorney who was bent on maintaining the action against Mr. Horne, and reluctant to face the restrictions placed on litigants under federal bankruptcy law."[101]  While this Court does not eagerly sanction parties, especially attorneys, Deltona's bankruptcy counsel's conduct was so outrageous that punitive damages, and possibly additional Rule 9011 sanctions, are warranted to deter this behavior in the future.

---

[99] *In re Horne*, 876 F.3d at 1079.

[100] *Id.* at 1086. The court held that the phrase "including costs and attorneys' fees" in section 362(k)(1) is designed to include actual damages beyond the immediate injury incurred in ending the violation of a stay.  Congress intended the word "including" to serve as a word of enlargement; attorneys' fees incurred in prosecuting an action to "obtain full relief under the statute, including any entitlement to actual and punitive damages, is as much a part of the debtor's 'actual damages' as those incurred in stopping the stay violation." *Id.* at 1081.

[101] *In re Horne*, Case No.: 11-00096, Doc. 352, p. 34, *Transcript* (Bankr. S.D. Ala. Jan. 24, 2013).

### C. Deltona's bankruptcy counsel is ordered to show cause why this Court should not impose additional sanctions under Fed. R. Bankr. P. 9011.

Rule 11(b) of the Federal Rules of Civil Procedure, made applicable by Federal Rule of  Bankruptcy Procedure 9011, places an affirmative duty on attorneys to make a reasonable investigation of the facts and the law before signing and submitting any petition, pleading, motion or other paper:

> **(b)  Representations to the Court.**  By presenting to the court (whether by signing, filing, submitting or later advocating) a . . . motion or other paper, an attorney . . . is certifying [to the court] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —
>     (1)  it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>     (2)  the claims, defenses and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>     (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>     (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief. [102]

---

[102] Fed. R. Civ. P. 11(b) made applicable by Fed. R. Bankr. P. 9011.

"Signing or advocating a paper that violates this standard may result in the imposition of sanctions [under Fed. R. Bankr. P. 9011]. . . ."[103] Attorneys and parties are required to "think first and file later"; to "look before leaping."[104]

This Court may impose sanctions under Rule 11 using its inherent authority; to do so, it must afford a party to be sanctioned due process both in determining that the requisite bad faith exists and in assessing damages.[105] Deltona's bankruptcy counsel is on notice that all conduct outlined in this Order constitutes grounds for potential Rule 11 sanctions.

## CONCLUSION

As soon as Debtor notified Deltona, its state court counsel, and the Washington County Clerk of Court that she had filed bankruptcy, everything in connection with the foreclosure sale should have stopped. Automatically.

---

[103] 10 Collier on Bankruptcy P 9011.04 (16th ed. 2018).

[104] *Id.* (citing *Stewart v. RCA Corp.,* 790 F.2d 624 (7th Cir. 1986) and *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151 (3d Cir. 1986)).

[105] *Miccosukee Tribe of Indians of Florida v. Cypress,* 686 F. Appx. 823, 825 (11th Cir. 2017) (citing *In re Mroz,* 65 F. 3d 1567, 1575 (11th Cir. 1995)).

Deltona and its bankruptcy counsel could, and should, have repaired the harm caused by the foreclosure sale by reversing the sale almost immediately. They did not.

Deltona could have given Debtor access to her property, replaced the mailbox, and stopped its employee from spying on, or stalking, the Debtor. It did not.

Deltona and its bankruptcy counsel could, and should, have immediately disclosed the initial stay violation to this Court, and prevented the continuing stay violations. They did not.

Deltona's conduct and that of its bankruptcy counsel cost Debtor money and caused her emotional distress. Had Debtor not filed the Sanctions Motion, none of this conduct would have come to light and Deltona and its bankruptcy counsel would have succeeded making a nullity of the Bankruptcy Code's automatic stay and a mockery of this Court and the entire bankruptcy system.

For the reasons stated, it is

ORDERED:

1. Debtor's Sanctions Motion (Doc. 78) is GRANTED.

2. Pursuant to 11 U.S.C. §362(k), The Deltona Corporation is ordered to pay Debtor, Dahlia Andreen Harrison, actual and punitive damages in the total amount of $45,500.00 as follows:

   a. Actual damages in the amount of $10,400.00, made up of $400.00 in compensatory damages and $10,000.00 in emotional distress damages.

   b. Punitive damages in the amount of $35,100.00 (actual damages of $10,400.00 x 3.375).

3. Pursuant to 11 U.S.C. §§ 105(a) and 362(k), Deltona's bankruptcy counsel, A. Clay Milton, H. Matthew Fuqua, and Fuqua & Milton, P.A., jointly and severally, are ordered to pay Debtor, Dahlia Andreen Harrison, actual and punitive damages in the total amount of $15,000.00 as follows:

   a. Actual damages in the amount of $5,000.00, as and for additional emotional distress damages.

   b. Punitive damages in the amount of $10,000.00 (actual damages of $5,000.00 x 2).

4. Within twenty-one (21) days from the date of this Order, Deltona and its bankruptcy counsel shall pay the sums awarded via

official check, trust account check or cashier's check(s) by overnight or hand delivery to Debtor at her address of record in this case. Within seven (7) days of Deltona and its bankruptcy counsel paying the amounts awarded, Deltona's bankruptcy counsel shall file proof of payment with this Court.

5. If check(s) payable to Debtor are returned as undeliverable, Deltona and its bankruptcy counsel shall make a good faith effort and take whatever steps may be reasonably necessary to locate a current address for Debtor and re-deliver the checks. In the event they are unable to locate Debtor after making reasonable effort, Deltona's bankruptcy counsel shall file an affidavit setting forth the efforts to locate Debtor, serve a copy of the affidavit to all known addresses for Debtor, and pay the amounts due to Debtor pursuant to this Order into the Registry of this Court.

6. Within three (3) days from the date of this Order, Deltona's bankruptcy counsel shall deliver a copy of this Order to the parties listed below and file a certificate of service:

    a. Lora C. Bell, Clerk of Court for Washington County, Florida;

    b. Tracy Williams, Assistant Treasurer of The Deltona Corporation; and

    c. The Deltona Corporation's Chief Executive Officer.

7. The Court retains jurisdiction to enforce the terms of this Order and to ensure that the requirements and spirit of this Order are fulfilled.

## ORDER TO SHOW CAUSE:

8. Pursuant to Rule 9011(c)(1)(B), within twenty-one (21) days from the date of this Order, Deltona's bankruptcy counsel, A. Clay Milton and H. Matthew Fuqua, of Fuqua & Milton, P.A., are ordered to show cause in writing why this Court should not exercise its inherent power to impose additional sanctions and, if it should, what sanctions are appropriate for their actions throughout this case, as described in detail in this Order.

DONE and ORDERED on   March 8, 2019          .

KAREN K. SPECIE
Chief U.S. Bankruptcy Judge

A. Clay Milton or H. Matthew Fuqua, bankruptcy counsel to The Deltona Corporation, are directed to serve a copy of this Order on interested parties and file a proof of service within three (3) days of this Order.